UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| SHAWN G., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:18-cv-00570-JMS-TAB |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| | ) | |
| Defendant. | ) | |

## ENTRY REVIEWING THE COMMISSIONER'S DECISION

Plaintiff Shawn G. was a participant in the "Ticket to Work" program established by Congress and administered by the Social Security Administration ("SSA") to help people receiving disability benefits find work. Participants may take advantage of the regulatory trial work period to collect disability insurance benefits ("DIB") and work earnings for a set time period. *See generally Tumminaro v. Astrue*, 671 F.3d 629, 633-34 (7th Cir. 2011). Eventually, however, a participant may no longer collect disability benefits in addition to a paycheck. In June 2011, the SSA notified Shawn G. that he had received benefits to which he was not entitled since April 2009, resulting in an overpayment of $32,605.70. Shawn G. sought a waiver of the overpayment, claiming that the overpayment was not his fault and that repayment would cause him financial hardship. After the SSA denied his waiver request, Shawn G. requested and received a hearing before Administrative Law Judge Mario Silva ("the ALJ"). On May 27, 2016, the ALJ issued an opinion finding that Shawn G. was not at fault for the overpayment, but that waiver would not be appropriate because Shawn G. has the ability to repay. The ALJ further recommended that Shawn G. be required to repay no more than $150 per month. The Appeals Council denied review on January 5, 2018, making the ALJ's decision the final decision of the Commissioner subject to judicial review. [Filing No. 4 at 5.]

Shawn G., proceeding *pro se*, as he did before the ALJ, timely filed his Complaint pursuant to 42 U.S.C. § 405(g), asking this Court to review the denial of his waiver request. [Filing No. 1.] The Court concludes that the ALJ properly found that Shawn G. is able to repay the overpayment. However, accepting the ALJ's unchallenged calculation, Shawn G.'s repayment plan would leave him with at most $50 per month as a buffer for unanticipated and fluctuating expenses. The Court holds that this narrow margin is incompatible with the regulatory requirement that repayment not consume "substantially all of [a claimant's] current income . . . to meet current ordinary and necessary living expenses." 20 C.F.R. § 404.508(b). Therefore, for the reasons explained below, the Court **AFFIRMS IN PART** the Commissioner's decision not to waive repayment and **REVERSES AND REMANDS IN PART WITH INSTRUCTIONS** to form a plan requiring payments of no more than $100 per month.

**I.
STANDARD OF REVIEW**

The Court reviews the Commissioner's waiver decision under the same standards ordinarily applied in the denial of benefits context, affirming the Commissioner's decision as long as it is supported by substantial evidence and is not contrary to law. *See Banuelos v. Apfel*, 165 F.3d 1166, 1169 (7th Cir. 1999), *overruled in part on other grounds by Johnson v. Apfel*, 189 F.3d 561, 562-63 (7th Cir. 1999)). For the purpose of judicial review, "[s]ubstantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004) (quotation omitted).

# II.
## BACKGROUND

**A. Employment Background & Waiver Request**

In October 2003, Shawn G. began receiving DIB due to his disabling depression and mental illness. [*See* [Filing No. 6 at 3-4](#) (Shawn G.'s explanation of medical history); [Filing No. 4 at 81](#) (doctor's letter stating that Shawn G. has a disability); [Filing No. 4 at 137](#) (certificate of completion from St. Vincent Stress Center Adult Day Therapy Program); [Filing No. 4 at 116](#) (reflecting disability onset date in April 2001).] After receiving information regarding the Ticket to Work program from the SSA, which was designed to assist people with disabilities in returning to work, [[Filing No. 4 at 84-85](#); [Filing No. 4 at 89-93](#)], Shawn G. began meeting with vocational rehabilitation counselors in October 2006 through the state social services agency, [[Filing No. 4 at 97](#); [Filing No. 4 at 99](#)]. In October 2007, the state agency placed Shawn G. in a job a security guard. [[Filing No. 4 at 118](#).]

In 2010 and 2011, the SSA sent Shawn G. several letters regarding his work income. On September 26, 2010, the SSA sent Shawn G. a letter asking for more information about his work activity. [[Filing No. 4 at 132-34](#).] On November 5, 2010, the SSA sent Shawn G. a letter indicating that the SSA did not give him "credit for your earnings in 2009" and explained that he would receive an increased benefit payment. [[Filing No. 4 at 135-36](#).]

On June 18, 2011, the SSA sent Shawn G. a letter explaining that he likely was not entitled to DIB payments beginning in April 2009. [[Filing No. 4 at 139](#).] The letter explained that the nine month trial work period, during which a DIB recipient could keep both disability benefits and work income, had expired in December 2008, and that Shawn G. was also entitled to benefits for the three months after the trial work period ended. [[Filing No. 4 at 140-41](#).] The letter explained how Shawn G. could submit more information regarding his income and explained that the SSA would

notify him regarding any overpayments. [Filing No. 4 at 141-42.] On June 28, 2011, the SSA sent Shawn G. a letter explaining that "[w]e have decided that your disability has ended and that you are not entitled to Social Security disability payments beginning April 2009," based upon his work activity. [Filing No. 4 at 143.] The letter set forth the overpayment amount and explained that Shawn G. could repay the money, appeal the determination, or request a waiver. [Filing No. 143-146.]

After reaching out to a U.S. senator for assistance, in August 2013 Shawn G. submitted a waiver request stating that he was not at fault for the overpayment and that repayment would cause him financial hardship. [*See* Filing No. 4 at 154-56.] The SSA field office denied the requested waiver on August 30, 2013. [Filing No. 4 at 156.] By letter dated November 27, 2013, the SSA explained that it found Shawn G. at fault for the overpayment and explained how Shawn G. could appeal the waiver denial. [Filing No. 4 at 162.]

On February 18, 2016, Shawn G. completed additional waiver application paperwork, explaining that he and his spouse owed approximately $15,000 for an early withdrawal from his spouse's 401k account to fix up homes for their children. [Filing No. 4-1 at 20-25.] Shawn G.'s application indicated that he had household monthly income of $3,900 and household monthly expenses of $3,768. [Filing No. 4-1 at 26.]

### B. Hearing before the ALJ

On April 6, 2016, the ALJ held a hearing on Shawn G.'s waiver request at which Shawn G. appeared *pro se*. [Filing No. 4 at 20-52.] The ALJ informed Shawn G. of his right to representation and offered to reschedule the hearing if Shawn G. wished to look for representation. [Filing No. 4 at 22-23.] After verifying that Shawn G. wished to proceed *pro se*, the ALJ questioned him about his work history. [Filing No. 4 at 24-26.] Shawn G. explained that he

4

believed that the SSA and Ticket to Work program would monitor his wages and notify him if his benefits needed to be adjusted. [Filing No. 4 at 25-28.]

The ALJ next asked Shawn G. what he may be able to repay if the ALJ ordered a repayment schedule. [Filing No. 4 at 35-56.] Shawn G. explained that "at one time" he "offered to pay $100 a month," but that he no longer believed that repayment would be fair because of mistakes in monitoring his benefits and because of how long it would take for him to repay the overpayment. [Filing No. 4 at 35-36.] After the ALJ again asked, "Is there an amount that you believe that you're capable of repaying?" Shawn G. responded, "There—like I said before, I said $100 a month." [Filing No. 4 at 37.]

The ALJ asked Shawn G. about two properties he had owned at one point. [Filing No. 4 at 46.] Shawn G. explained that he and his wife had bought them with funds from his spouse's 401k to fix up for his daughters to live in. [Filing No. 4 at 46.] Shawn G. was in the process of renovating them in 2013 when he submitted his first waiver request. [Filing No. 4 at 46-47.] Shawn G. explained that he purchased the properties because his daughters had difficulties with evictions and he wanted his grandchildren to have stable housing, and that he transferred title in the houses to his daughters. [Filing No. 4 at 47-48.]

The ALJ indicated several times that he understood Shawn G.'s arguments that he was not at fault for the overpayment, but explained to Shawn G. that he also needed to consider Shawn G.'s ability to repay. [Filing No. 4 at 38; Filing No. 4 at 48.] In response, Shawn G. reiterated that he believed that he was not at fault for the overpayment because the SSA was supposed to coordinate its Ticket to Work program with DIB payments. [Filing No. 4 at 49.] Shawn G. indicated that he understood that the ALJ needed to consider his ability to repay, but didn't "necessarily agree with it. I think that if somebody is not at fault for something, that they're not

5

at fault." [Filing No. 4 at 49.] Shawn G. stated that repayment would be "a punishment I don't deserve." [Filing No. 4 at 50.]

### C. The ALJ's Opinion

On May 27, 2016, the ALJ issued his opinion finding that Shawn G. was not entitled to waiver. [Filing No. 4-1 at 39-42.] The ALJ first found that Shawn G. was overpaid $32,605.70 in DIB after successfully returning to work. [Filing No. 4-1 at 41.] The ALJ next found that Shawn G. was not at fault for the overpayment, finding that Shawn G. reasonably believed that he had met his obligation to report his work activity through his participation in the Ticket to Work program. [Filing No. 4-1 at 41.]

Despite Shawn G.'s lack of fault, the ALJ concluded that waiver was not appropriate. [Filing No. 4-1 at 42.] First, the ALJ found that recovery would not violate "equity and good conscience" because there was "no evidence the claimant changed his position for the worse or relinquished a valuable right because of reliance upon a notice that a payment would be made or because of the overpayment itself . . . ." [Filing No. 4-1 at 42.] Finally, the ALJ concluded that Shawn G. "has the ability to repay the overpayment," explaining as follows:

> The claimant had earnings of $38,890 in 2014 and $31,150 in 2015 and he testified that he and his wife have a combined net annual income of approximately $48,000 per year. The claimant has monthly net wages of approximately $2086 per month (Exhibit 15). The claimant owns his home with a monthly mortgage payment, and he and his wife have two cars, one with a monthly payment. The claimant had two properties worth approximately $20,000 each, which he gifted to his daughters. He is currently paying a penalty to the IRS related to early withdrawal of his retirement account. A review of the claimant's reported income and expenses reveals that his net income is roughly $200 in excess of his regular monthly expenses. The evidence supports that the claimant has the ability to repay the overpayment.

[Filing No. 4-1 at 42.] Based upon this finding, the ALJ concluded that repayment could not be waived and "recommend[ed] that a reasonable monthly repayment be established and that this amount should not exceed $150 per month." [Filing No. 4-1 at 42.]

**D. Procedural History in This Court**

On January 5, 2018, the Appeals Council denied Shawn G.'s request for review, making the ALJ's decision the final decision of the Commissioner. [Filing No. 4 at 5-8.] Shawn G. timely filed his *pro se* Complaint in this Court on February 27, 2018, seeking judicial review of the Commissioner's waiver determination. [Filing No. 1.] The Commissioner filed the administrative record on May 7, 2018, [Filing No. 4], and Shawn G.'s Complaint for Review is now fully briefed and ripe for decision.

## III.
### DISCUSSION

As he did before the ALJ, Shawn G. argues that repayment should be waived because he was not at fault for the overpayment, specifically because the SSA failed to monitor the Ticket to Work program and because the SSA provided him inaccurate information regarding his status as a DIB recipient. [Filing No. 6 at 9-12.]

In response, the Commissioner agrees that the ALJ found Shawn G. to be without fault. [Filing No. 11 at 9-10.] The Commissioner argues, however, that a lack of fault is only step one of the waiver analysis, and that Shawn G. makes no argument as to step two—that he is unable to repay or that repayment would violate equity or good conscience. [Filing No. 11 at 9-12.] Finally, the Commissioner argues that, waiver notwithstanding, the ALJ reasonably concluded that Shawn G. could repay the excess benefits. [Filing No. 11 at 11-12.]

In reply, Shawn G. repeats his arguments and contends that the SSA's actions are "far too egregious" to deny waiver. [Filing No. 12 at 2.]

Explaining the framework applied by the ALJ in this case requires tracing through three levels of governing text: the statute; the SSA's regulation interpreting the statute; and the SSA's nonbinding, internal procedures (called the Program Operations Manual System, or "POMS")

7

which operationalize (and interpret) the regulation. Statutory interpretation must begin with the statutory text. *Cf., e.g.*, *Wisc. Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2070 (2018) ("As usual, our job is to interpret the words [of the statute] consistent with their ordinary meaning . . . ." (internal quotation omitted)); *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1618 (2018) (noting that deference under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), comes into play only after exhausting the "traditional tools of statutory construction" (internal quotation omitted)).

The relevant statutory provision provides as follows:

> In any case in which more than the correct amount of payment has been made, there shall be no adjustment of payments to, or recovery by the United States from, any person who is without fault if such adjustment or recovery would defeat the purpose of this subchapter or would be against equity and good conscience.

42 U.S.C. § 404(b)(1). As the statute indicates, the SSA must grant a waiver to aid recipients who, like Shawn G., are without fault if 1) requiring repayment "would be against equity and good conscience" or 2) recovery would "defeat the purpose" of the Social Security Act. *Id.*

The SSA has promulgated regulations defining each of these terms. The first defines "equity and good conscience" as follows:

> Recovery of an overpayment is against equity and good conscience . . . if an individual [c]hanged his or her position for the worse . . . or relinquished a valuable right . . . because of reliance upon a notice that a payment would be made or because of the overpayment itself . . . .

20 C.F.R. § 404.509(a)(1).

Shawn G. makes no argument suggesting that he changed his position in reliance upon a payment notice, and in fact expressly disavows any reliance upon the SSA's November 2010 letter which explained that he would receive an increased benefit payment. [Filing No. 6 at 11 ("The plaintiff admits that he did not solicit or rely on the letter received from Commissioner Astue [sic]

8

on November 7, 2010 . . . .")."] As Shawn G. has made no showing to the contrary, the ALJ's finding that repayment would not violate equity and good conscience, as set forth in the statute and defined by the regulation, is supported by substantial evidence.

A second regulation defines "defeat the purpose of this subchapter" as follows:

(a) General. Defeat the purpose of title II, for purposes of this subpart, means defeat the purpose of benefits under this title, i.e., to deprive a person of income required for ordinary and necessary living expenses. This depends upon whether the person has an income or financial resources sufficient for more than ordinary and necessary needs, or is dependent upon all of his current benefits for such needs.
. . .
(b) When adjustment or recovery will defeat the purpose of title II. Adjustment or recovery will defeat the purposes of title II in (but is not limited to) situations where the person from whom recovery is sought needs substantially all of his current income (including social security monthly benefits) to meet current ordinary and necessary living expenses.

20 C.F.R. § 404.508.

Again, Shawn G. makes no specific argument challenging that ALJ's conclusion that he has sufficient income to repay his overpayment in installments in addition to his living expenses. Nor does Shawn G. challenge the ALJ's assessment that his "net [joint] income is roughly $200 in excess of his regular monthly expenses." [Filing No. 4-1 at 42.] Shawn G. has therefore waived any challenge to these findings.[1]

---

[1] It is not at all clear from the face of 42 U.S.C. § 404(b)(1) that the SSA is entitled to consider a beneficiary's spouse's income in deciding whether repayment would "defeat the purpose" of the subchapter, inasmuch as the statute allows the United States to recover only from a "person" who receives an overpayment. The regulation uses the broad phrase "financial resources" to assess that person's ability to repay, 20 C.F.R. § 404.508(a), and the SSA's POMS requires the ALJ to compare household income and expenses, SSA POMS GN 02250.115(A)(3) (2005). While the POMS would appear to be a reasonable interpretation of the regulation's "financial resources" language, likely entitled to *Skidmore* deference (discussed below), it is difficult to reconcile the SSA's consideration of household income with the statute's singular "person" from whom the government may seek repayment. *Cf. Epic Sys. Corp.*, 138 S. Ct. at 1618 (concluding that *Chevron* deference is warranted only when cannons of statutory interpretation do not yield clear result). *But see Rodysill v. Colvin*, 745 F.3d 947, 950 (8th Cir. 2014) (upholding POMS consideration of joint income under *Auer* deference). Shawn G. does not contest that ALJ's reliance on his spouse's

But the plain language of section 404.508(b) explains that recovery will defeat the purpose of title II where the beneficiary "needs **substantially all** of his current income" to cover living expenses. 20 C.F.R. § 404.508(b) (emphasis added). Accepting the ALJ's unchallenged finding that Shawn G. has a $200-a-month surplus in income after deducting household expenses, the ALJ's $150-per-month payment plan leaves Shawn G. (and his spouse) with only $50 a month buffer for unanticipated and emergency expenses. In a published opinion from 1991, Judge Lozano of the Northern District of Indiana held that recovery from a beneficiary who had a $143 surplus in monthly income would defeat the purpose of the Act because that minimal surplus indicated that the beneficiary needed "substantially all" of his income for regular expenses. *Teamer v. Sec'y of Health & Human Servs.*, 764 F. Supp. 1328, 1333-34 (N.D. Ind. 1991). As Judge Lozano observed, repayment would "place [the beneficiary] in a precarious financial position, unable to cope with unforeseen expenses or emergencies." *Id.* at 1333.

But in 2005, well after *Teamer* was decided, the SSA issued an internal POMS policy, explaining as follows: "Every household has some unbudgeted or unaccountable expenses. In comparing income and expenses, each household is allowed a margin of $25. This $25 margin is used to establish 'adjusted household expenses', which is compared to household income when deciding defeat the purpose." SSA POMS GN 02250.115(A)(3). At least one district court has found *Teamer* unpersuasive because it predated the POMS. *Collier v. Colvin*, 2016 WL 8603654, at *7 n.6 (E.D. Va. 2016), *adopted*, 2017 WL 1100435 (2017). Relying upon the POMS, *Collier* upheld a denial of waiver where the beneficiary had a monthly cushion of $131.43. *Id.* at *7.

The propriety of the $50 margin allowed in this case turns on whether the POMS warrants deference. Many "courts have reviewed the POMS and afforded it *Skidmore* deference." *Hall v.*

---

income, however, so the Court need not weed through the levels of deference to determine whether the SSA's scheme comports with § 404(b)(1).

10

*Sebelius*, 689 F. Supp. 2d 10, 21 (D.D.C. 2009) (collecting cases); *see also Cannon v. Apfel*, 213 F.3d 970, 975 (7th Cir. 2000) (giving "respectful consideration" to POMS interpretation of statute). That particular form of deference, which takes its name from *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), affords discretion to an agency's interpretation of a statute to the extent it has the "power to persuade." *Vulcan Constr. Materials, L.P. v. Fed. Mine Safety & Health Review Comm'n*, 700 F.3d 297, 316 (7th Cir. 2012) (quoting *Skidmore*, 323 U.S. at 140). "In assessing the persuasive power of an agency's interpretation, 'we examine the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.'" *Id.* (quoting *Arobelidze v. Holder*, 653 F.3d 513, 520 (7th Cir. 2011)).

While *Skidmore* deference applies to the POMS' statutory interpretation (and thus applies to the extent the POMS interprets "defeat the purpose" in 42 U.S.C. § 404(b)(1)), a heightened form of deference named after *Auer v. Robbins*, 519 U.S. 452 (1997), generally applies to an agency's interpretation of its own regulations. *See Rodysill*, 745 F.3d at 950 (applying *Auer* deference to POMS' interpretation of SSA regulations). When *Auer* applies, "an agency's interpretation of its own validly issued regulation is 'controlling unless it is plainly erroneous or inconsistent with the regulation.'" *Exelon Generation Co., LLC v. Local 15 Int'l Bhd. of Elec. Workers, AFL-CIO*, 676 F.3d 566, 576 (7th Cir. 2012) (quoting *Auer*, 519 U.S. at 461). But *Auer* has come under broad attack in recent years, both by members of the Supreme Court and by scholars, and "[t]he Supreme Court's application of [*Auer*] deference has been sporadic." *Id.* at 576 n.5 (internal quotation omitted) (collecting authorities). *See generally* Christopher J. Walker, *Attacking* Auer *and* Chevron *Deference*, 16 Geo J.L. & Pub. Pol'y 103 (2018) (providing comprehensive overview of *Auer* critiques). Though an agency's interpretation of its ambiguous

11

regulation need not be the "best or most natural one," it still must be a "reasonable construction" to receive deference. *Whetsel v. Netwrok Prop. Servs., LLC*, 246 F.3d 897, 901 (7th Cir. 2001).

Whether the POMS interprets the statute and warrants *Skidmore* consideration or interprets the SSA's regulations and thus falls under *Auer*, it cannot justify the $50 monthly buffer allowed by the ALJ in this case. The phrase "substantially all of [a beneficiary's] current income" cannot reasonably be construed to mean a surplus of $25 per month. *Cf. Teamer*, 764 F. Supp. at 1333-34. Considering the *Skidmore* factors, nowhere does the POMS explain how this number was arrived at, and it has not been updated since it was implemented back in 2005. For the same reasons, this fixed dollar amount cannot meet the initial "reasonableness" hurdle should *Auer* deference apply. It stretches credulity beyond its breaking point to suggest that a minimal dollar amount, fixed some 13 years ago, would still today allow households to accommodate "unbudgeted or unaccountable expenses." SSA POMS GN 02250.115(A)(3).

The $150-a-month payment plan set forth by the ALJ would require Shawn G. to use "substantially all" of his income for essential expenses and for paying back the overpayment. This repayment plan would therefore "defeat the purpose" of the Act as set forth in the statute and the SSA's regulation. In assessing what a reasonable payment plan would be, the Court notes that Shawn G. himself suggested at the hearing that he could pay $100 a month without exhausting all of his resources. This would leave a $100 buffer in monthly income, per the ALJ's calculations, to allow for Shawn G. to "cope with unforeseen expenses or emergencies," *Teamer*, 764 F. Supp. at 1133, and the POMS allows for a repaying beneficiary to request further modification of a payment plan should the situation change. The Court will therefore remand Shawn G.'s application with instructions that the SSA implement a plan requiring no more than $100 in monthly repayments. *Cf. Kaminski v. Berryhill*, 894 F.3d 870, 875-76 (7th Cir. 2018) (remanding

with instructions to award benefits where "all factual issues . . . have been resolved" (internal quotation omitted)).

## IV.
### CONCLUSION

For the foregoing reasons, the Court **AFFIRMS** the Commissioner's decision to deny Shawn G.'s waiver request but **REVERSES** the ALJ's payment plan and **REMANDS** this matter to the SSA with instructions to implement a plan requiring no more than $100 in monthly repayments. Final judgment shall issue accordingly.

Date: 8/3/2018

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

Distribution:

SHAWN G.
515 S. West
Lebanon, IN 46052-2475

Lu Han
SOCIAL SECURITY ADMINISTRATION
lu.han@ssa.gov

Kathryn E. Olivier
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
kathryn.olivier@usdoj.gov

13